# Exhibit A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JOEL GERARD BARTHLOW, and
ALEXIS N. BARTHLOW,
    Plaintiffs,

        v

INTERNATIONAL MOTOR SPORTS
ASSOCIATION, LLC, *d/b/a IMSA*

Case No. 16-     NO
Hon: Annette J. Berry

16-012037-NO
FILED IN MY OFFICE
WAYNE COUNTY CLERK
9/20/2016 3:13:29 PM
CATHY M. GARRETT

DAVID F. ZUPPKE, PLC
David F. Zuppke (P-31240)
Attorneys for Plaintiff
25892 Woodward Ave.
Royal Oak, MI 48067
(248) 206-5900
(248) 542-6301 (fax)
david@zuppkelaw.com

/

## COMPLAINT AND JURY DEMAND

*There was a prior civil action between these parties arising out
of the same transaction or occurrence as alleged in this complaint, **15-015903-NI**.
Hon: Annette J. Berry
That case was voluntarily dismissed without prejudice.*

Plaintiff complains as follows:

## JURISDICTION AND VENUE

1.    At all relevant times, Plaintiffs, Joel Gerard Barthlow, ("BARTHLOW"), and ALEXIS N. BARTHLOW, ("ALEXIS"), BARTHLOW'S wife, were residents of Oakland County, Michigan.

2. At all relevant times, Defendant International Motor Sports Association, LLC, ("IMSA"), was a foreign limited liability company doing business in Wayne County, Michigan.

3. IMSA'S Michigan Resident Agent is CSC-Lawyers Incorporating Service (Company), located at 601 Abbot Road, East Lansing, Michigan 48823.

4. The underlying tort occurred in Wayne County, Michigan.

5. The amount in controversy exceeds the sum of Twenty- Five Thousand Dollars, ($25,000), and this matter is otherwise within the jurisdiction of this Court.

## FACTS

6. BARTHLOW incorporates by reference paragraphs 1 through 5 above as though fully restated herein.

7. On May 30, 2015, IMSA was the sanctioning body of the TUDOR, (sponsor), United SportsCar Championship Race Series which took place on Belle Isle in Wayne County, Michigan, i.e. "Belle Isle Grand Prix".

8. IMSA, through its agents and/or employees, established the Rules and Regulations, including the IMSA Sporting Regulations, Series Supplementary Regulations, Technical Regulations, and the Event Supplementary Regulations, for the race.

9. IMSA exercised and maintained full supervision and control over the event and the various races.

10. IMSA was responsible for monitoring and supervising the race, deploying safety and rescue personnel, as well as ordering implementation of racing flags throughout the race, among other responsibilities.

11. IMSA, at all times, had exclusive control and sole discretion to determine if and when a race session would start and stop, and if and when an emergency vehicle would be dispatched, and if and when flag signals would be used, including the type of flag signal that might be used during a race session.

12. IMSA, at all times, had exclusive control and sole discretion to direct volunteers and Mobile Emergency Rescue Vehicles, ("MERVS"), as it deemed appropriate or necessary.

13. IMSA, at all times, had exclusive control and sole discretion to halt the race or a race session for safety reasons.

14. On May 30, 2015, at approximately 1:50 p.m., BARTHLOW, a fireman by vocation, was a volunteer with the Sports Car Club of America, ("SCCA"), serving as a commander of a MERV crew for the Tudor Championship race.

15. IMSA directed BARTHLOW and his Mobile Emergency Response Vehicle, ("MERV"), crew to station themselves outside of "Turn 1" of the course, instead of the normal position for the MERV.

16. Approximately half way through the 100 minute race, it began raining and the track became wet causing one of the drivers to spin out.

17. The track remained wet and it continued to rain with less than ten minutes left.

18. With approximately two minutes left, the sky broke open with a heavy rain storm that drenched the track and created a treacherously slippery track ripe for aquaplaning of the race cars which were equipped with treadless "slick" tires.

19. The rain and splashing water significantly reduced visibility.

20. Near the end of the race with approximately two minutes left, the Wright Motorsports Porsche driven by Jan Heylan crashed into the wall near Turn 1.

21. His vehicle became disabled, smoking, and on fire as the rain intensified.

22. Without notifying BARTHLOW as to whether the race would be stopped, BARTHLOW was immediately dispatched to attend to and/or rescue Heylan and his vehicle on the "hot" track.

23. From the control tower established and staffed by IMSA, IMSA'S "Race Director" or "Chief Steward", had actual knowledge of, and the ability to observe by eyesight and cameras, the weather conditions throughout the race course, and in particular, the area approaching turn 1.

24. Upon the order of IMSA, BARTHLOW and his crew were out on the track in Turn 1 where his MERV was properly directed.

25. IMSA was able to observe BARTHLOW out of his vehicle.

26. Despite its actual knowledge that Heylan's car was crashed and disabled near turn 1, and that a rescue crew was outside of their MERV on the wet and slippery track performing the rescue service they were directed to perform, IMSA made a conscious decision not to stop the race or order a "full course" or "double yellow" flag which would have alerted all of the drivers that there was an incident or extreme danger on the track, and which would have prevented the drivers from trying to improve their "positions".

27. For expediency purposes, and without any regard for the safety of BARTHLOW or others on the track, IMSA made a selfish, conscious, and intentional decision to finish the race without implementing the foregoing safety measures.

28. IMSA could have employed numerous, well-established safety measures including: directing that a double-yellow or full course flag be thrown, which would have required all of the drivers on the track to "slow" their vehicles and "maintain their positions".

29. IMSA could have directed that a "red flag" be thrown which would have compelled all of the racers to stop racing for safety reasons.

30. The above listed safety measures are designed and employed to prevent serious and deadly accidents on the race course.

31. Employment of these safety measures were within IMSA'S sole discretion.

32. Instead, IMSA made the conscious decision to utilize a "local yellow" flag near BARTHLOW'S turn, which in this case under the weather conditions at the time, was only visible by the drivers as they were essentially within striking distance of BARTHLOW.

33. Moreover, under a local yellow flag, the drivers were allowed to continue to race at high speeds likely to cause aquaplaning under the existing weather conditions.

34. While BARTHLOW was out on the track, the checkered flag was waved and all of the drivers except the first place driver, continued to race to capture the best finishing position possible.

35. IMSA had actual knowledge that at the end of races, drivers frequently "push" the speed limits in an effort to maximize their finishing position.

36. IMSA had actual knowledge that turns are typically more hazardous areas than straightaways.

37. After the checkered flag was waved, and while he was approaching turn 1, Aston Martin driver James Davison attempted to brake his vehicle but it aquaplaned out of control, hit the wall and crashed into BARTHLOW'S MERV.

*

*

*



38. BARTHLOW was then launched into the air, landing in a pile of tires.

39. The track was so treacherous that only seconds after Davison aquaplaned out of control, at least two other cars and drivers did so in the same corner.

40. BARTHLOW suffered serious debilitating injuries which have rendered him permanently disabled.

41. As a condition of allowing BARTHLOW and all of the other volunteer first responders to assist with the race, BARTHLOW was required to sign a "waiver-release" written in "legalese", which purported to release IMSA and others from their own negligent acts and omissions.

42. In other words, in exchange for his unpaid Good Samaritan volunteering, IMSA shamefully rewarded BARTHLOW by negligently causing him and his family to suffer life changing personal injuries, while insulating itself, (and others), from any legal responsibility for such negligence.

43. In addition, IMSA included unenforceable language in the document purportedly releasing itself and others for the severe damages and injuries its "Gross Negligence" caused.

44. The gross negligence release language may have been added in an effort to mislead injured volunteers from seeking legal assistance to pursue gross negligence claims, despite the fact that such releases are unenforceable and against the public policy of the State of Michigan.

6

## COUNT I – GROSS NEGLIGENCE

45. Plaintiffs incorporates by reference paragraphs 1 through 44 above as though fully restated herein.

46. BARTHLOW provided a financial benefit to IMSA and was IMSA'S business invitee at the time of his accident.

47. IMSA had knowledge of a hazardous situation requiring the exercise of ordinary care and diligence to avert injury to BARTHLOW.

48. IMSA had the ability to avoid the harm caused to BARTHLOW by ordinary care and diligence in the use of the means at hand.

49. IMSA had the legal duty to use reasonable care and diligence to avert and prevent the danger to BARTHLOW, when to the ordinary mind, it was apparent that without use of such means, a disastrous result would likely occur.

50. IMSA'S decision to only direct the throwing of a local yellow flag was improperly motivated by a desire to finish the race.

51. IMSA'S decisions were so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiff.

52. In fact, IMSA'S acts and omissions reflect an attitude that it had **_no_** concern for BARTHLOW'S well-being and safety.

53. Moreover, upon information and belief, IMSA acted with such disregard for BARTHLOW because it believed that it was insulated from liability by a release.

54. IMSA created an unreasonable risk of harm to BARTHLOW and demonstrated a callous lack of concern for whether he would suffer an injury.

7

55. It was foreseeable to IMSA that its decisions would result in an injury producing accident.

56. As a direct and proximate result of IMSA'S breach of duties owed to BARTHLOW, he sustained serious and permanent economic and non-economic injuries and damages.

57. BARTHLOW suffered a serious impairment of body function and permanent serious disfigurement, including, but not limited to the following:

   (a)   serious and permanent orthopedic, ligament, neurological, muscular, vascular, and brain injuries to his body, resulting in disability and requiring medical intervention, including, but not limited to lengthy hospitalization and surgeries, and which may require additional surgeries, therapies and/or medical care for the balance of his life and have severely affected and limited his activities of daily living as well as other related and appreciable difficulties, injuries, or consequences that have or may occur or develop;

   (b)   aggravation or exacerbation of any preexisting condition;

   (c)   pain, suffering, mental anguish, fright, shock, denial of social pleasure and enjoyments, embarrassment, humiliation, mortification, disability, and/or emotional distress;

   (d)   economic losses including medical expenses, wage losses and a permanent loss of earning capacity;

58. Defendant is liable for the gross negligence of its agents and employees through the doctrine of respondeat superior.

WHEREFORE, BARTHLOW seeks a judgment in his favor and against IMSA in whatever amount in excess of Twenty-Five Thousand ($25,000) Dollars the trier of fact deems fair and reasonable, plus costs, interest, and if available, attorney fees.

### COUNT II - LOSS OF CONSORTIUM

59. Plaintiffs incorporate by reference paragraphs 1 through 58 above as though fully restated herein.

60. At the time of the occurrence, BARTHLOW and ALEXIS were married, and they remain married today.

61. As a direct and proximate result of the grossly negligent acts and omissions of IMSA, ALEXIS has suffered, and will continue to suffer, loss of consortium, loss of society, affection, assistance, and conjugal fellowship with BARTHLOW, to the detriment of her marital relationship.

WHEREFORE, ALEXIS seeks a judgment in her favor and against IMSA in whatever amount in excess of Twenty-Five Thousand ($25,000) Dollars the trier of fact deems fair and reasonable, plus costs, interest, and if available, attorney fees.

### COUNT III – DECLARATORY JUDGMENT MCR 2.605

62. BARTHLOW and ALEXIS incorporate by reference paragraphs 1 through 61 above as though fully restated herein.

63. This case involves an actual controversy within this Court's jurisdiction.

64. A declaratory judgment is necessary to guide the parties' future conduct in order to preserve legal rights.

65. Specifically, the parties shall require the Court to interpret a "Release and Waiver" Agreement that BARTHLOW signed three days before the accident, *Exhibit 1*.

9

66. In particular, the parties need the Court to determine:

    a. Whether or not the "Release and Waiver" is enforceable in full or part and whether it bars BARTHLOW from pursuing a negligence claim;

    b. Whether or not the agreement is enforceable in any manner against ALEXIS, who never saw nor signed the document nor authorized BARTHLOW to execute it on her behalf;

    c. And if not, the extent to which it may derivatively bar an ordinary negligence claim by ALEXIS.

67. Prior to the filing of this Complaint, BARTHLOW was scared into permitting his prior attorneys to dismiss his initially filed lawsuit regarding this matter.

68. Specifically, he was scared by a threat from IMSA'S attorney that IMSA would "come after" BARTHLOW for reimbursement all legal fees it incurred in defending itself against any liability.

69. The threat to come after BARTHLOW for attorney fees was premised upon vague and ambiguous indemnity language inserted into the same document:

> or upon the restricted area, and/or competing, officiating in, observing, working for, or for any purposes ........
> 2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS THE "RELEASEES" and their insurance carriers and each of them from any loss, liability, damage, or cost they may incur due to the presence of the undersigned in or upon the restricted area or in any way competing, officiating, observing, or working for, or for any purpose participating at any time in the EVENT(S) and whether caused by the negligence or gross negligence of the "RELEASEES" or otherwise.
> ................... FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE DUE TO THE

70. Though BARTHLOW'S present counsel opines that the indemnity language is unenforceable, BARTHLOW was bullied into the prior dismissal because he was afraid that he would be rendered penniless if he tried to enforce his legal rights against IMSA.

71. ALEXIS never signed any agreements and never authorized BARTHLOW to execute or sign any agreements on her behalf.

72. BARTHLOW had no authority to act as her agent or waive any rights or assume any indemnity obligations.

73. ALEXIS intends to prosecute her consortium claim based upon both a claim of gross negligence, and ordinary, common law negligence, if the Court deems such a claim permissible.

74. BARTHLOW also intends to prosecute a claim of ordinary negligence if the Court deems it permissible.

75. However, before this case proceeds through full discovery, the Plaintiffs seek the guidance of this Court with respect to their claims in order to reduce indemnity exposure if the Court disagrees with their attorney's opinion.

76. BARTHLOW contends that pre-accident exculpatory releases *are not* enforceable for gross negligence claims under long established Michigan law.

77. IMSA'S attorney further stated that IMSA plans to seek reimbursement of any legal fees that it incurs, pursuant to the indemnity language in the Agreement.

78. BARTHLOW contends that the indemnity language is unenforceable as being vague and ambiguous, and under any interpretation, inapplicable here.

79. ALEXIS anticipates that IMSA will also move to strike and bar her independent consortium claims based upon the same legal document.

80. ALEXIS contends that the document doesn't release any of her independent claims, i.e. ordinary negligence and gross negligence.

81. Among others, one reason the language shouldn't apply to ALEXIS, is that on its face, the document only applies to BARTHLOW and his *"personal representatives, assigns, heirs, and next of kin"*.

82. ALEXIS is none of those as a matter of law.

    a. Personal representatives are *only* appointed after a person dies; BARTHLOW is still alive;

    b. ALEXIS isn't an assignee;

    c. ALEXIS is a "*presumptive* heir", not an "heir". Heirs are only determined *after* the death of an ancestor;

    d. Next of kin is strictly defined as a "blood relative". ALEXIS is a spouse and not a blood relative.

83. Because the document is a vague, ambiguous, and a misleading adhesion agreement, it must be interpreted against IMSA.

84. Unless and until the Court determines these various legal issues, successful settlement negotiations are undoubtedly going to fail.

85. Unless the Court makes a determination of the legal issues, each of which may be dispositive, the parties will be forced to engage in far more discovery than might otherwise be necessary.

86. Until the parties can fairly gauge their respective rights visa-vis the legal document, each will incur unnecessary expenses and attorney fees.

87. Under any scenario, it is in everyone's best interests for the Court to address the legal issues presented by the Release and Waiver document.

88. There is an urgency and need for an expedited hearing on this matter.

89. Furthermore, there is a great public interest to be decided with respect to the rights and limitations of volunteer first responders

WHEREFORE, Plaintiff seeks a declaratory judgment and an expedited hearing, to determine the dispositive legal issues.

## COUNT IV– ORDINARY NEGLIGENCE IN THE ALTERNATIVE

90. Plaintiffs incorporates by reference paragraphs 1 through 89 above as though fully restated herein.

91. Plaintiffs assert an ordinary negligence claim "in the alternative", subject to this Court's further order(s), in order to protect against waiving their claim in the event the Court deems the subject agreement unenforceable in full or in part.

92. IMSA owed BARTHLOW and ALEXIS certain common law duties, including but not limited to the following:

   a. Not to dispatch BARTHLOW onto the race track until all traffic had cleared the track in the event it wasn't going to employ a full course caution, or double yellow flag, or red flag;

   b. To keep a reasonable lookout for the hazardous weather and condition of the track at the time it elected to dispatch BARTHLOW;

   c. Before and after it dispatched BARTHLOW onto the track, to exercise ordinary care and diligence to avert injury to BARTHLOW;

   d. To warn *all* drivers on the track that there was a MERV with men on the track by throwing the proper colored flag, e.g. a red or double yellow flag, or otherwise ending the race under a "full-course caution";

   e. To delay the race until BARTHLOW was off the track;

   f. To act as a reasonably prudent person or business would in same or similar circumstances; to act pursuant to and in accordance with industry standards;

   g. To use due care and caution in race control;

   h. To develop, promulgate and enforce appropriate policies and procedures, in

accordance with industry standards, regarding the deployment of safety and rescue personnel,

i. To order and implement appropriate racing flags under the circumstances;

j. To properly hire, train, and/or supervise its employees;

k. To ensure that its employees or agents possessed the necessary skill, experience and/or knowledge to perform their duties in a safe and prudent manner, among other duties of care.

93. IMSA breached all of its duties to Plaintiffs.

94. As a direct and proximate result of IMSA'S breach of duties owed to Plaintiffs, BARTHLOW sustained serious and permanent economic and non-economic injuries and damages, including those set forth above.

95. As a direct and proximate result of IMSA'S breach of duties owed to Plaintiffs, both have suffered, and will continue to suffer, loss of consortium, loss of society, affection, assistance, and conjugal fellowship to the detriment of their marital relationship.

96. IMSA is liable for the ordinary negligence of its employees through the doctrine of respondeat superior.

WHEREFORE, Plaintiffs seek a judgment in their favor and against IMSA in whatever amount in excess of Twenty-Five Thousand ($25,000) Dollars the trier of fact deems fair and reasonable, plus costs, interest, and if available, attorney fees.

Respectfully submitted,

September 19, 2016

BY: /s/
DAVID F. ZUPPKE, ESQ. (P31240)
25892 Woodward Avenue
Royal Oak, MI 48067
(248) 206-5900